Good morning. My name is Sonam Henderson. I'm from the Office of the Federal Public Defender and I represent Julio Alvarado. I'd like to reserve two minutes for rebuttal. I want to start with the initial seizure here, which the government denies was a seizure. Here we have a man and a woman sitting in a parked car at the end of a quiet cul-de-sac. It's 11 at night. The man and the woman are talking. They're not interacting with anyone or anything outside of the car. Then all of a sudden, two police cars swoop in simultaneously. Now the couple have gone from enjoying a quiet moment together to being the targets of an obviously targeted police action. The police cruiser is parked perpendicular to the couple's car, restricting their ability to simply drive away and end the interaction. And then both police cars turn on their spotlights, which are police tools used in part to temporarily blind the occupants of the vehicle. And the police shine those spotlights into the car and into the eyes of the couple. The officers then get out and start approaching the car. Government's asking you to accept that a reasonable person sitting awash in these spotlights, hemmed in by two police cars, and realizing that this isn't any kind of random check or drive-by, but a coordinated police action, would feel free to leave. That's absurd. No reasonable person in that situation would think they could just, you know, turn on their ignition and drive away. And that's common sense, but it's also supported by case law. Both parties cite the same standard from United States v. Washington, which looks at whether the police outnumber the people being approached, whether the police have visible weapons, whether the setting was public or private, or non-public, I guess. Counsel, even if we agreed with you or assumed arguendo that you were correct, why wasn't there enough reasonable suspicion of criminal activity afoot to justify a Terry's thought? Sure. So, reasonable suspicion, as the court knows, can't be based on information that the the officers don't have when they undertake the seizure. They need to have the information. It can't be filled in after the fact. So here, the only information that the officers say that they have before undertaking the seizure was that there was a report of a green Honda parked in a red zone in the vicinity of 501 East Oxford Street. They don't have any of the other information that shows up in the recording of the call. It's not transmitted to them. So they don't know anything about the caller saying that he lived at the location, that he knew that the car didn't belong to his neighbors, that the caller seemed to have eyewitness knowledge of what was going on in the car, or that the caller left his name and telephone number. They knew it was a 911 call. Actually, Your Honor, there's not a scrap of evidence that it was a 911 call. The government repeatedly refers to it as a 911 call and invokes all the 911 call cases. But there's nothing in the record saying that it's a 911 call. No declaration calls it a 911 call. No report calls it a 911 call. And if you listen to the recording itself, they don't, the operator doesn't identify themselves as 911. They identify themselves as Santa Ana police. They knew someone called in and said that they had observed this car at night on this cul-de-sac parked in a red zone? Yes. And that's it. And so at the point the police get there, you know, drive up simultaneously, hem them in, hit them with the spotlights, that's the only information they have. They haven't verified that it's actually occurring. It's very similar to the situation in Florida v. JL, where it's, you know, essentially, from the police officer's perspective, an anonymous call that's reporting criminal activity, but in this case, not even really criminal. So in your view, in your view, that doesn't justify them walking up to the car and seeing what's going on? Well, that's not what they did. Well, you said they parked next to the car, they shined their spotlight, but even if they just walked up to the car, the occupants wouldn't have felt free to leave, right? I don't know that that, I mean, let's take a different scenario. If they'd driven up, parked, you know, some distance behind, as you see happening in other cases, in a normal kind of inline fashion, as opposed to perpendicular, to hem them in, and just approach the car with flashlights and look down to see whether there was in fact a red curb, I don't see a problem with that. If they'd driven by the front of the car or the back of the car and just done kind of a sweep with their headlights to see if there was a red curb, obviously there's no problem with that. They're allowed to engage. The problem here is that they seized before engaging. Well, they had gotten a report of illegal activity and they went up to the car, and even if you're right that it's a seizure, they were trying to determine what was going on. I don't, why is, why does that violate Terry? How are the interests that underlie Terry violated by this encounter? So it's an veracity, the verifying veracity. Didn't the call give some information about the caller, their location? The call did give that information. There's no indication that that information made it from the dispatcher down to the officers. So that, I mean, that's. I'm curious, you say it wasn't a 9-1-1 call. The district court found it was a 9-1-1 call. How could we say she clearly erred? I mean, if that was the district court's finding, and I'm sorry I don't have that right in front of me, but it would be clear error in the sense that there's not a, again, not a scrap of evidence about it. There's nothing in the record whatsoever that says 9-1-1 call. Well, the district court certainly made that finding at page 21 of the excerpts of record. So then I would be telling you that that's a clearly erroneous finding because it is, it's not, it's not supported by the record here. There's just nothing in the record that, that, that supports that. And, I mean, even to the extent that it is a 9-1-1 call, I mean, we're, we're still talking about a situation in which it's, it's unverified. And the 9-1, the call's saying, well, you can have, I'm sorry, the case is saying you can have an anonymous 9-1-1 call. Those involve serious and ongoing criminal situations, someone shooting at cars, drunk driving. But the, the 9-1-1 call wasn't anonymous. The person identified themselves. They said they lived in, in the cul-de-sac. They said they gave their name to the operator. From, from the office perspective, it's certainly anonymous because they don't say they, they, they don't, they say specifically in the reports that they don't find out who the person is until after the fact. But does that, does that make it an anonymous call? In other words, are you saying if the, the operator, not 9-1-1, if the operator had said we have a call from John Yes. I mean, the, it's, the, the information that matters for reasonable suspicion is the information that comes to the officers on the ground. But what about the collective knowledge theory? The collective knowledge theory applies to a couple of different situations, neither of which is present here. You can have a team of officers working closely together, so, and, and then if they're in communication, you assume that the information that one has, the others have. Or you can have an officer who has all the information, makes a reasonable suspicion determination, and then broadcast that determination to someone else and ask them to act on it. So that, those are the, the two points, places where it works. Here you're talking about a, a dispatcher who may or may not even be a law enforcement officer, getting information and not, not passing it along. The Second Circuit in United States v. Cologne looked at, at this exact circumstance. The thing, I mean, so they reported a green Honda Acura was parked in a red zone and was not known in that area. And then the police officers arrive and see a green Honda Acura parked in the red zone. So that, doesn't that verify the tip? They don't see that it's parked in the red zone. That's, that's part of it. But what they do see is it's wedged in between, in a very narrow sidewalk with two drive, with a driveway on each side. I mean, it's not like a normal, it's not as if it's some huge parking street. They see it in a cul-de-sac wedged there in this very small area. So it, it certainly doesn't look like a normal parking area and they can't see what's behind it because the car's parked in front of it, right? No, they could have, again, they could have driven around the front or driven around the back and, and tried to take a look at it. And, and they, I mean, whether they could see it or not, the point is that they haven't, they haven't verified it. There's no ordinance or anything else that the government's put forward that, you know, small spaces between driveways of less than 15 feet. Counsel, does your brief argue anywhere that the district court supposedly clearly erred in finding that there was a 9-1-1 call? I'm looking at page 19 of your brief and you say, nor can the government concoct reasonable suspicion by observing that the 9-1-1 operator or dispatcher knew what the officers did not. Did you raise this issue in your brief? We did not. But, and, and again, I would, I would just point to the, the, the 9-1-1 call cases require more. It's these dangerous situations and not a, at most, parking violation, which is, which is like kind of a, maybe the most, least dangerous situation imaginable in that situation. The, in a, in a dangerous, you know, a dangerous ongoing situation, maybe it makes sense to, to run out and act on the information without verifying this is a parking violation. They're answering 25 minutes later, they could have taken a sweep and taken a look before seizing them. And I see that I'm almost out of time and I want to reserve my last few seconds. All right, thank you, counsel. Good morning, your honors. Will Rollins on behalf of the United States. May it please the court. I want to start first by addressing defense counsel's point that there is no evidence in the record that there was a 9-1-1 call. First, I direct the court's attention to the record at page four, in which, in response to an argument from defense counsel below that the officers didn't know the curb was red, Judge G concluded that they were dispatched there for that reason, and then at ER 21, the district court specifically said, together with the other factors, that there was a 9-1-1 call, reporting a suspicious vehicle matching the description and the location of defendant's car, and then continued on. And in response to the district court's point that the officers were dispatched there for that reason, excuse me, the, the reason being the red curb. The defense counsel then agreed with the district court and argued that the officers needed to conduct additional investigation. Not that the officers didn't know that the call had been reported via 9-1-1. And the other point that I'd just like to make about the 9-1-1 call is, I think that's a little bit beside the point, because whether it was reported via 9-1-1 or simply some other type of call to the police, the thrust of the authority on anonymous tips in this context has to do with whether the officers on the scene know that that information is easily corroborated or can be determined with easy investigation. And so in this context, even assuming that the officers believed it had just been reported merely by telephone, for example, rather than 9-1-1. They also had some additional facts. For example, the dispatch alert saying that the car wasn't known to the area. And then the specific address provided by the reporting party. And so in United States versus Palos, I think it was Palos Martinez, this court indicated that it's really the thrust of the issue about whether an anonymous tip is reliable relates to whether the officer could reasonably conclude that the informant's identity can be determined with only a small amount of investigation. And then one other point I just wanted to say in response to defense counsel. The record at ER 39, there's no evidence that the spotlights were shined into the eyes of the occupants in this case. In fact, at ER 39, the police report, one of the officers indicates that he illuminated his spotlight to light the inside of the vehicle. And in Washington, this court held on similar facts, where an officer was illuminating the inside of a vehicle using a flashlight. But the seizure in that particular case did not begin at that moment. And then- Did that case involve two patrol cars coming up at night in a cul-de-sac and with a spotlight? No, it did not, Your Honor. That case involved a single officer approaching a car with a flashlight. But I would direct the court's attention also to United States versus Chan Jimenez, in which a police car actually pulled up behind a stopped car, activated not only lights, but I believe the blue and red emergency flashing lights. And the court in this circuit in that case also indicated that the seizure did not occur at the moment that the red and blue lights were flashing. And I think that depended in part because on the fact that the car was already stopped. And so in this case, the car was already stopped and parked when the officers approached. And I know that defense counsel articulated the standard for reasonable suspicion as whether the occupants of the car would have felt free to leave. But I really think the more appropriate question in line of the standard to use for seizure in this context comes from Bostick, not the Mendenhall-Royer test, which is reasonable ability to leave. And Bostick, the standard articulated there is whether a reasonable person would feel free to terminate the encounter. Well, at what point do you think that Alvarado was seized? I think at the show hands order, Your Honor. So you don't think it was when the cars came and blocked him in? No, Your Honor. I don't think so under this court's precedent. I don't think that he was seized at that moment. And I would respectfully disagree with the court's characterization as them having blocked in the vehicle. Well, didn't they park perpendicularly around his car? So that, I mean, if they were parked there, he couldn't move his car out, could he? Well, Your Honor, I think the record actually indicates that he was parked in a cul-de-sac, and that according to the officer's declarations, they did both say perpendicular, but both police reports also stated that the officers parked behind. And those two things, in my view, are not mutually exclusive. And so I think that- Okay, how do you say both were parked behind and both were parked? You're saying they parked lined up this way? Where's the evidence in the record for that? So actually, defense counsel, I believe, attached a Google Maps street view of the cul-de-sac. And then, of course, the declarations themselves. So the police report, that would be at ER 39, Officer Rias stated that, I parked my police vehicle behind the Acura. And then police report for Officer Pace, ER 46, upon our arrival, we observed defendant's vehicle at the end of the cul-de-sac, facing south, and we proceeded to park our vehicles behind it. And then the officer's declarations at ER 61 to 66. ER 62 for Officer Pace, he indicated that he parked perpendicular. And Officer Ria, ER 55, also indicated that he parked perpendicular. Counsel, even if we, let's say we accept what you just read as the facts, hypothetically, if in response to that, the defendant had just simply driven away, wouldn't the government be arguing that that in itself was enough ground to then affect the Terry stop, even if it hadn't occurred prior to that? I think, Your Honor, if that had happened, the argument in this case would involve whether that flight was provoked or unprovoked. And as Your Honor is aware, I'm sure that there is a line of authority holding that mere flight from officers can give rise to reasonable suspicion. But in this case, if the defendant, rather than making furtive movements and apparently concealing a handgun on the floorboard, had simply rolled down the window and or said to the officer through the open window, can I help you? I'd like to leave. Then he would have been free to leave at that point. But that's not what happened. We don't need to decide that question. Is that correct? That's correct, Your Honor. You don't, because the district court also concluded, I believe, at ER 21, I think that that factual finding, which was even if the officers didn't perceive the parking violation at the moment that they arrived, there were other facts in the record that had already provided reasonable suspicion to effectuate the stop at the cul-de-sac. And unless the panel has any further questions. Thank you very much. Thank you. All right, I'll give you a minute, Mr. Henderson. Just a couple of quick notes. On the issue of perpendicular or behind, the declarations say perpendicular. The government prepared, you know, the officer prepared those with the lawyer. They're careful. It's sworn testimony, as opposed to a report. If we were having a hearing and I was trying to impeach them with a report, it doesn't make any sense for both of them to park perpendicular behind the car. It doesn't. And that was another point I was going to make. I don't know how the second car would shine its spotlight at that point, because it would be shining it through the first car. So I think perpendicular in the T-shape is really what makes sense on the record here. I don't know how much time to dig into this, but just in terms of the district court's ruling, the district court seems to be focused on the second stop, the hands on the wheel. And the district court justified that through information that the officers clearly didn't have at the point that the hands were sent to the wheel. The identification of Mr. Alvarado as a parolee, that happens after they approach the car and begin talking to him, which is after the hands go on the wheel. The perception of nervousness happens once Officer Raya reaches the car and again is after the hand movement. So the district court's relying on facts here that the officers just plainly didn't have. All right. Thank you, counsel. Thank you. United States versus Alvarado will be.
judges: Wardlaw, Cardone, Bennett